# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

**No. ACM 39304**

————————————

**UNITED STATES**
*Appellee*

**v.**

**Homaira KHALJI**
Captain (O-3), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 31 January 2019

————————————

*Military Judge:* Joseph S. Imburgia.

*Approved sentence:* Dismissal. Sentence adjudged 4 April 2017 by GCM convened at Dyess Air Force Base, Texas.

*For Appellant:* Major Mark J. Schwartz, USAF.

*For Appellee:* Lieutenant Colonel Joseph J. Kubler, USAF; Lieutenant Colonel G. Matt Osborn, USAF; Mary Ellen Payne, Esquire.

Before JOHNSON, DENNIS, and LEWIS, *Appellate Military Judges*.

Judge DENNIS delivered the opinion of the court, in which Senior Judge JOHNSON and Judge LEWIS joined.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 18.4.**

————————————

DENNIS, Judge:

Contrary to her pleas, a panel of officer members convicted Appellant of one specification of drunk on duty and one specification of wrongful use of cocaine in violation of Articles 112 and 112a, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 912, 912a. The panel acquitted Appellant of one addi-

tional specification of drunk on duty and sentenced her to a dismissal. The convening authority approved the sentence as adjudged.

The charges against Appellant largely stem from blood and urine samples collected on 14 September 2016. That day, after a duly appointed magistrate had authorized a search for blood to determine Appellant's alcohol level, Appellant was placed into custody and escorted to the base clinic to have her blood drawn. While waiting for her blood to be drawn, Appellant experienced a medical emergency which led to her being transferred to an off-base hospital. Hospital staff requested both blood and urine samples. After Appellant refused to provide a urine sample, a commander ordered her to do so. When she was unable to provide a sufficient sample, medical personnel involuntarily collected her urine using a catheter. The results of the blood test revealed Appellant had alcohol in her system. The results of the urine test revealed Appellant had a metabolite of cocaine in her system.

Both at trial and now on appeal, Appellant challenges the lawfulness of these searches. Through counsel, she challenges (1) whether the military judge erred when he denied the Defense's motion to suppress the urine obtained from a catheter forcibly inserted into Appellant's body;[1] and (2) whether the military judge erred when he denied the Defense's motion to suppress the results of the search of Appellant's blood and urine.[2] We find that the military judge abused his discretion in denying Appellant's motion to suppress the results of the search of Appellant's urine obtained from a catheter. We set aside the finding of guilt for wrongful use of cocaine. We also set aside the sentence.[3]

---

[1] At trial, Appellant challenged the lawfulness of the search of urine under the Fourth Amendment. U.S. CONST. amend. IV. She did not raise a Fifth Amendment due process claim at trial. U.S. CONST. amend. V. Given our resolution of Appellant's Fourth Amendment claim, we need not address whether Appellant forfeited her due process claim under Rule for Courts-Martial 905(e).

[2] Appellant also personally raises five assignments of error pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982): (1) whether the Government's failure to disclose favorable material evidence in its possession constitutes reversible error; (2) whether the Security Forces Flight Chief violated Appellant's constitutional rights in an effort to obtain the search authorization; (3) whether the extraction of Appellant's urine by a forced catheterization was not pursuant to medical necessity and required exclusion; (4) whether the hair test results were unreliable and their admission violated Appellant's right to confrontation; and (5) whether the search of her hair was based on an inadequate affidavit and therefore invalid.

[3] We have considered the first issue personally raised by Appellant—whether the Government's failure to disclose favorable material evidence in its possession consti-

*(Footnote continues on next page)*

## I. BACKGROUND

Appellant, a judge advocate, was assigned to the base legal office at Dyess Air Force Base (AFB), Texas, in March 2015. By August 2016, Appellant was experiencing both legal and medical troubles which led to her being temporarily relieved of her duties. Her legal troubles stemmed from an alleged driving under the influence (DUI) incident first made known to her command on 30 August 2016.[4] Around the same time, Appellant's supervisor, the Dyess AFB staff judge advocate ("the SJA"), was informed that Appellant was taking several prescribed medications which affected her behavior. Appellant's military medical provider informed the SJA he would adjust Appellant's medication but added the caveat that abruptly stopping her medications or mixing them with alcohol could have "fatal" consequences. The military medical provider further indicated that it would take approximately two weeks for Appellant to be weaned off the medications and that Appellant "may be seen as acting 'shifty'" during that period.

The events giving rise to Appellant's court-martial occurred on 14 September 2016, approximately two weeks after the change in medication.[5] The events are best categorized by the four locations at which they took place: the Dyess AFB legal office, the Base Defense Operations Center, the Dyess AFB clinic, and the off-base hospital.

### A. The Dyess AFB Legal Office

On the morning of 14 September 2016, several members of the legal office noticed Appellant either smelling of alcohol, having difficulty maintaining her train of thought, appearing disheveled, fumbling for her belongings or

---

tutes reversible error—and find it is without merit and warrants no further discussion. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987). Because the second and third issues personally raised by Appellant also allege error in the military judge's denial of Appellant's motion to suppress the results of the searches of Appellant's blood and urine, we address them together with the issues raised by her counsel. Finally, given our resolution of Appellant's Fourth Amendment claim, we do not address the assignments of error related to the search of Appellant's hair.

[4] Appellant's DUI arrest occurred on 14 February 2016, but her command did not become aware of the arrest until Appellant attempted to obtain a base pass after forgetting her military identification card in her government office.

[5] The military judge thoroughly outlined the events of 14 September 2016 in a 52-page ruling on Appellant's motions to suppress. Unless otherwise indicated, the facts outlined in the background section are taken from the military judge's findings of fact.

otherwise acting "uncharacteristically." At the same time, the SJA was meeting with the Comptroller Squadron Commander ("the commander")—who had administrative control over Appellant—and the Eighth Air Force (8 AF) staff judge advocate to discuss a command-directed investigation into Appellant's DUI. Eventually, the base deputy staff judge advocate ("the DSJA") relayed the reports regarding Appellant's condition to the SJA. The SJA then notified the commander that "he suspected [Appellant] was drunk on duty, possibly from the mixture of both alcohol and prescription drugs." The SJA then advised the commander and Appellant's first sergeant how to advise Appellant of her rights under Article 31, UCMJ, 10 U.S.C. § 831, and how to ask Appellant if she would consent to a urinalysis.

The commander and the first sergeant did as instructed and Appellant invoked her rights to counsel and to remain silent. When the commander asked Appellant if she would "submit to a drug screening voluntarily," she declined and "did not consent to any testing of her bodily fluids."

Following Appellant's invocation, the SJA asked an assistant staff judge advocate to "sit with [Appellant] in her office while he discussed next steps." The SJA then contacted the Security Forces Squadron (SFS) Commander. The military judge found that:

> The call was placed because at that time, [the SJA] felt he and his staff needed to de-conflict themselves from providing any further legal advice on the matter. They did so to protect the rights of [Appellant] and to go out of their way to avoid the appearance of conflicts. [The SJA] wanted himself and his office to provide support for [Appellant], and knew that ethically, they could not be witnesses against [Appellant] and simultaneously provide support to, and also advise on the case against, her. [The SJA] felt [the Security Forces Commander] and his members could provide adequate law enforcement assistance for a potential probable cause response and search authorization, and also knew they had more expertise in detecting individuals who may be under the influence of intoxicating substances.

In addition to obtaining the services of security forces, the SJA appointed a reserve judge advocate who had been temporarily assigned to the Dyess AFB legal office to serve as the neutral legal advisor for the military magistrate as well as the law enforcement team. The neutral legal advisor was not privy to Appellant's "behavior and actions that day." The SJA directed him to seek any additional advice from the 8 AF legal office.

When the security forces team, led by the SFS flight chief, arrived at the legal office, they met with the SJA, DSJA, and law office superintendent. They each provided different observations of Appellant's condition. Despite the initial reports, "no one would commit" to whether Appellant smelled of alcohol. Their conversation grew contentious when the SJA informed the flight chief that Appellant had invoked her rights to counsel and to remain silent, but the flight chief insisted he would "continue to investigate the allegation" and "speak with [Appellant] to determine if he could detect behavioral clues and the odor of alcohol." The flight chief likened his planned encounter to a "DUI traffic stop" wherein he "planned to create a situation where he could observe possible signs of intoxication by alcohol." The flight chief's analogy appeared to allay the SJA's concerns. In ruling on Appellant's motion to suppress, the military judge noted that the flight chief "left the meeting with the three [judge advocate] representatives" without "acting against the advice of any attorneys or legal advisors." Notably, the neutral legal advisor did not participate in this conversation.

The SJA, DSJA and law office superintendent then accompanied the security forces team to Appellant's office. When they arrived, the assistant staff judge advocate who had been assigned to "sit with Appellant" after her invocation of rights informed them that Appellant was in the bathroom vomiting. When Appellant came out of the bathroom and saw the SJA, she said, "So, what, now I'm drunk on duty?" The security forces team then followed her into her office and closed the door.

Once inside, the flight chief introduced himself to Appellant and requested her military identification card and driver's license. When Appellant did not respond to his introductions, the flight chief asked again for her driver's license. Appellant responded verbally for the first time and stated that she did not have a driver's license. The flight chief found her response strange and asked, "Ma'am, you don't have a driver's license?" Appellant did not respond, but provided the flight chief her billfold which did not contain her driver's license. The flight chief again requested her driver's license. When Appellant stood up to retrieve her purse, the flight chief "detected a strong odor of alcohol emanating from her person."

Regarding the interaction between Appellant and the flight chief, the military judge made the following findings of fact:

> Based on his observations of [Appellant], [the flight chief] was of the opinion that [Appellant] was under the influence of alcohol. He observed [Appellant] looking flushed and disheveled (both hair and uniform), with glassy eyes, slurred speech, impaired motor function, and smelling of alcohol.

Even without the odor of alcohol, based on his own visual observations, combined with the observations of the legal office staff, he would have sought probable cause search authorization for [Appellant]'s blood to detect her blood alcohol content anyway.

## B. The Base Defense Operations Center

The flight chief passed along his observations to the Base Defense Operations Center (BDOC) controller who, in turn, initiated a call with the designated neutral legal advisor and the military magistrate. During the Article 39(a), UCMJ, hearing on Appellant's motion to suppress, the flight chief testified that "there [was] no mention of getting urine or looking for anything other than alcohol in [Appellant]'s system." He added, "I've never dealt with urine. It's difficult with an intoxicated subject, or if they refuse to give consent, how are we supposed [to] retrieve urine as a sample." The flight chief did not participate in the unrecorded call. The BDOC controller told the military magistrate "she believed [Appellant] was drunk on duty" and asked the military magistrate to "determine that probable cause existed to seize [Appellant]'s blood in order to search the sample for alcohol." The probable cause statement for the search authorization also asserted that the SJA believed Appellant was under the influence of alcohol and that other members of the legal office made similar observations of Appellant. The military magistrate "gave verbal search authority at 1107 hours specifically to search [Appellant]'s blood for the presence of alcohol."[6]

The military magistrate "was not made aware of [Appellant]'s prescriptions or the morbid concerns expressed by [Appellant]'s medical staff" or "[t]he fact that [Appellant] may be acting 'shifty' for 2 weeks as her medications were changed." In hindsight, the military magistrate was unsure whether knowing that information would have changed his decision, but was confident that slurred speech and the odor of alcohol served as the two "main triggers" in his belief that alcohol may be in Appellant's blood. The military judge found that "[n]one of [Appellant]'s prescription medications would cause the odor of alcohol on [Appellant]'s breath or in [Appellant]'s office."

---

[6] The verbal search authorization was reduced to writing the next day and included a written affidavit signed by the flight chief. The military judge found that the information contained in the flight chief's affidavit was the same as the information provided to the military magistrate prior to granting the verbal search authorization.

## C. The Dyess AFB Clinic

Upon receipt of the search authorization, the flight chief escorted Appellant to the base medical clinic "for a blood draw pursuant to search authorization." The flight chief stayed with Appellant as they waited for a technician to perform the blood draw. While they were waiting, Appellant began to have what was later identified as a panic attack. Appellant began exhibiting a variety of concerning symptoms to include wobbling back and forth and rapidly bouncing her feet up and down. Appellant soon "began to hyperventilate and nearly fell out of her chair" prompting the flight chief to catch her. The flight chief remained with Appellant until medical staff arrived.

Shortly thereafter, someone on the scene called an ambulance to transport Appellant to Hendrick Medical Center (HMC), an off-base hospital. Appellant's military medical provider, a major, was among the providers who came to Appellant's aid. Despite the military medical provider's previous comments regarding the "lethal" consequences which might ensue if Appellant mixed her medications with alcohol, the military medical provider did not order anyone from the clinic to take Appellant's vital signs. When explaining his decision not to do so to the military judge, the military medical provider indicated that he "felt it was better left to the ambulance technicians and emergency room personnel." He also indicated that had Appellant been treated at the base clinic, he would have ordered blood and urine tests, but could not "have made her do any labs without her consent."

Before the ambulance arrived, the military medical provider spoke with the flight chief in whose custody Appellant remained. The flight chief provided the following testimony regarding his interactions with the military medical provider:

> I turned over the portion that we were attempting to do, which we never completed, which was a blood draw. There was an officer who said he was going to accompany her to the hospital.

> So I notified him that we did in fact already--the reason why we're here, what had led up to this point, and that we did have in fact search authority for blood for alcohol, so we wanted to make sure--I figured, and this is a natural assumption given anybody in sort of a physiologically compromised state that when somebody gets to a hospital they have to test them to find out what's wrong so they can treat them. So during the course of [sic] during those tests, we've already got search authority, we just need to get those results afterwards.

The military medical provider mistakenly believed there was a "judge's order" for Appellant's "labs" rather than a search authorization solely to test

Appellant's blood for alcohol content. When the military medical provider indicated that he would ride to the hospital with Appellant and pass along the order to the medical staff there, the flight chief "left the situation . . . and was not further involved."

But when the ambulance arrived, the military medical provider did not accompany Appellant to the hospital "believing instead that the civilian [emergency room] personnel and ambulance personnel would be best situated to care for [Appellant]." The ambulance eventually transported Appellant alone to HMC where she was met by her first sergeant at approximately 1237 hours.

**D. The Hospital**

HMC is the nearest hospital to Dyess AFB, but there was no agreement between the base and HMC to assist with law enforcement activities such as the involuntary extraction of bodily fluids.

Appellant and her first sergeant waited in the emergency room (ER) at HMC for approximately six hours. During this period, Appellant asked her first sergeant to take her home, but he refused.

There was also a stream of information flowing during the six hours Appellant was waiting to be seen in the ER. Appellant's first sergeant remained in constant contact with the commander. The commander remained in constant contact with the SJA. Both the commander and the SJA remained in contact with the military medical provider. The military judge found that, "[d]uring their conversations, all of them were under the mistaken impression that [the military magistrate] had ordered the search and seizure of [Appellant]'s blood and urine for alcohol content and the presence (or absence) of other substances." Despite having recused himself from matters related to the probable cause search authorization, the SJA sent a text message to the military medical provider checking on the status of the blood work: "In discussions with [the commander] . . . please confirm status / plans for blood work as soon as possible. We can provide lawful order through first sergeant if needed." Notably, neither the designated neutral legal advisor nor the flight chief participated in these conversations.

Following his discussion with the commander, Appellant's first sergeant later "informed the hospital staff that [Appellant] was military and was mandated to submit to a urinalysis while there."

At approximately 1905 hours, Appellant was assigned to an ER room and placed under the care of a nurse practitioner. The nurse practitioner was generally aware that Appellant had been taken to the hospital due to concerns reported by the military medical provider that Appellant was abusing prescription medications and mixing them with alcohol. The nurse practi-

tioner was also aware of other prescription medications Appellant was taking and that, based on what Appellant told her, Appellant drank alcohol the day before. After the nurse practitioner's initial assessment of Appellant, she "wanted to perform several standard tests on [Appellant] in order to assist her in diagnosing [Appellant]'s symptoms as well as rule out certain medical concerns, to include infections. One such test was a standard protocol urine screening." In his ruling denying Appellant's motion to suppress, the military judge found,

> [The nurse practitioner] did not order the labs for law enforcement purposes, or to search for the presence of potential narcotics. She ordered the labs before being told or asked to do so by anyone in the military. More specifically, [the nurse practitioner] came to the conclusion that she would need a urine toxicology screen and a urine test for infections before ever talking to anyone in the military. Blood work was also necessary. In [the nurse practitioner]'s medical opinion, a urine sample from [Appellant] was necessary for [Appellant]'s continued emergent treatment.

At approximately 1924 hours, Appellant's blood was drawn without objection from Appellant. The results of the blood draw revealed that approximately 12 hours after the first report of Appellant smelling of alcohol in the base legal office, Appellant had a blood alcohol concentration of 0.011.

The DSJA arrived to the hospital to relieve the first sergeant at approximately 2100 hours. Shortly after his arrival, hospital staff informed Appellant that she needed to provide a urine sample. Appellant refused. Appellant's refusal led to several significant conversations between 2100 hours and 2120 hours. All of the conversations discussed whether to order Appellant to provide a urine sample involuntarily. One set of conversations took place among her supervisory and command chain while another conversation took place among her medical providers.

Below is a summary of the conversations that took place among Appellant's supervisory and command chain:

- One conversation occurred between the SJA and the DSJA. The DSJA sent a text message to the SJA informing him that Appellant was refusing to give urine and their common belief that "the order still applies." A short while later, the DSJA sent another text message to the SJA asking, "What is the PC for? Urine Sample?" The SJA and DSJA then discussed over the phone that "the PC was a [sic] search for evidence of intoxicating substances."

- The DSJA also spoke with the commander. In this conversation, the commander specifically asked the DSJA if he could "give a direct order requiring [Appellant] to submit to the urinalysis." The DSJA agreed that the commander could issue the order. The military judge found that, "[a]fter discussing the legality of the direct order, [the commander] stated to [the DSJA]: 'I am directing [Appellant] to participate in the urinalysis process.'" Notably, the neutral legal advisor did not participate in this conversation.

- A third conversation occurred between the SJA and the commander to discuss Appellant's refusal to comply. The SJA confirmed that the commander had ordered Appellant to comply and that his team could "relay this to her."

In describing the conversations between the SJA, the commander and the DSJA, the military judge found,

> There was still confusion at this time concerning what the search authorization actually entailed, and all three believed it was for urine as well as for blood. The DSJA even asked that question of the SJA. The commander, the SJA, and the DSJA never called the command post, and they never called [the military magistrate], [the designated neutral legal advisor], or [the flight chief] to verify what the search authorization actually entailed. [The military medical provider] never did either. . . . [A]ny of those individuals could have clarified that the search authorization granted did not authorize the seizure and subsequent search of [Appellant]'s urine.

In describing the conversation between the military medical provider and the nurse practitioner, the military judge found,

> At some point before 2120 hours, [the nurse practitioner] spoke with [the military medical provider] and told him [Appellant] was refusing to provide a urine sample. [The military medical provider] told [the nurse practitioner]: "[Appellant] is mandated by the government to provide us with all labs and be cooperative." [The military medical provider] said this to [the nurse practitioner] not because he needed the tests as [Appellant]'s doctor, but because he was under the impression there was a "judge's order" for these labs. He did not relay to the nurse [practioner] that there was a judge's order.

> Although [the military medical provider] wanted and desired the results of the urine screens for medical purposes, he would not have forced [Appellant] to provide them had she refused.

> [The military medical provider] testified that as time passed by, he became less concerned the situation was "life or death," and he would definitely not have forced [Appellant] to provide a urine sample via catheterization at 2234 hours that night—over 11 hours after [Appellant] arrived at [the base clinic] for the blood draw.

> [The nurse practitioner]'s conversation with [the military medical provider] led her to believe that [the military medical provider] needed the labs. [The nurse practitioner]'s experience with past military members also made her think airmen always had to comply with medical treatment anyway.

Before the nurse practitioner returned to Appellant's hospital room, the DSJA informed Appellant that the commander had ordered her to provide a urine sample. Appellant attempted to comply with the order and began to self-hydrate. When the nurse practitioner returned, Appellant appeared cooperative, attempted to provide a urine sample but was unable to produce the requisite amount of urine to test. In accordance with HMC policy, a patient cannot be involuntarily catheterized for medical purposes unless they are exhibiting suicidal or homicidal behaviors. The military judge questioned the nurse practitioner regarding how this policy was applied to Appellant:

> Q. Just to clarify, you're saying that a catheter would be a standard procedure if a patient comes in and can't provide a sample? You would catheterize the patient?

> A. We offer them another chance to give us a urine specimen, and then we get the permission to do a catheter. We can't do it without their permission.

> Q. And in this particular case, did [Appellant], or your patient at that time, did she give permission for the catheter?

> A. I'm assuming she did. The nurse ended up doing the catheter.

> Q. But you don't know for sure? You just assumed that she gave permission?

> A. Yeah.

> Q. And if she didn't give permission, you wouldn't do a forced catheter?

> A. No.

It is worth noting that the nurse practitioner was not made aware of the other conversations involving the commander's order for Appellant to provide

a urine sample. So when Appellant was unable to provide an adequate sample, the nurse practitioner ordered what she described as an "in and out" catheter which was performed by another nurse at 2234 hours.

Shortly after 2300 hours, the SJA arrived at HMC. In a detailed witness statement, the SJA explained that when he arrived to Appellant's room in the ER, a member of the hospital staff asked if he wanted to hear the lab results. When he said "yes," the staff member walked over to Appellant and asked why she had cocaine in her system. The SJA later reported this information to a special agent with the Air Force Office of Special Investigations (AFOSI).

The next day, AFOSI used the SJA's statement regarding the "presumptively positive results for the cocaine metabolite in [Appellant]'s urine taken at HMC" to seek probable cause search authorization for Appellant's hair and urine. The search authorization was granted, and both hair and urine tests yielded positive results for the metabolite of cocaine.

## II. DISCUSSION

Appellant attacks the entirety of the forensic evidence used against her at trial. As outlined above, the facts underlying Appellant's Motions to Suppress her seized blood and urine are greatly intertwined, so much so that the military judge elected to issue a combined ruling articulating various theories of admissibility.

With respect to the search and seizure of Appellant's blood, the military judge found the evidence admissible on three grounds: (1) pursuant to a valid probable cause search authorization under Military Rule of Evidence (Mil. R. Evid.) 315 and Mil. R. Evid. 316; (2) pursuant to a valid medical purpose under Mil. R. Evid. 312(f); and (3) alternatively, pursuant to the exigent circumstances exception to the warrant requirement under Mil. R. Evid. 315(g) and Mil. R. Evid. 316(c)(5)(A). With respect to the search and seizure of Appellant's urine, the military judge found the evidence admissible pursuant to a valid medical purpose under Mil. R. Evid. 312(f). With respect to both, the military judge found that even if Appellant's rights were violated, the Government met its burden to show that exclusion of the evidence would not result in appreciable deterrence of future unlawful searches or seizures under Mil. R. Evid. 311(a)(3).

We find that the military judge properly admitted the results of the search and seizure of Appellant's blood, but abused his discretion in admitting the results of the search and seizure of Appellant's urine. Given the unique circumstances surrounding the collection of each of these, we consider, in turn, the admissibility of the evidence from the search and seizure of Appellant's blood and urine. As a final matter, we consider whether the mili-

tary judge abused his discretion in failing to apply the exclusionary rule to the search and seizure of Appellant's urine, and conclude that he did.

## A. The Search and Seizure of Appellant's Blood

Appellant asserts that the military judge erred in denying the Defense Motion to Suppress Appellant's Blood Seized and Derivative Evidence. We disagree.

We review a military judge's ruling on a motion to suppress evidence for an abuse of discretion. *United States v. Lutcza*, 76 M.J. 698, 701 (A.F. Ct. Crim. App. 2017) (citing *United States v. Freeman*, 65 M.J. 451, 453 (C.A.A.F. 2008)), *rev. denied*, 76 M.J. 402 (C.A.A.F. 2017). The military judge's findings of fact are reviewed for clear error, while the conclusions of law are reviewed de novo. *Id.* (citing *United States v. Keefauver*, 74 M.J. 230, 233 (C.A.A.F. 2015)). "[A] military judge abuses his discretion when his findings of fact are clearly erroneous, when he is incorrect about the applicable law, or when he improperly applies the law." *Id.* (quoting *United States v. Roberts*, 59 M.J. 323, 326 (C.A.A.F. 2004)). When reviewing a motion to suppress, "we consider the evidence in the light most favorable to the prevailing party." *Id.* (quoting *Roberts*, 59 M.J. at 326).

As previously discussed, the military judge applied three theories of admissibility in denying Appellant's motion to suppress her seized blood and derivative evidence: valid probable cause search authorization; valid medical purpose; and alternatively, exigent circumstances. Based on our resolution of the first two theories, we do not address the military judge's alternative theory of admissibility.

### 1. Admissibility Pursuant to a Probable Cause Search Authorization

Appellant alleges that the military magistrate had no basis upon which to conclude that there was probable cause to search Appellant's blood for alcohol content because: (1) "vital exculpatory evidence was never given to the security forces responders and the military magistrate"; and (2) the military magistrate's authorization was "based on evidence illegally obtained under the Fourth Amendment." We disagree.

The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. amend. IV.

Whether a search or seizure is "reasonable" depends, in part, on whether the person subject to the search has a subjective expectation of privacy in the thing to be searched, and that expectation of privacy is objectively reasonable. *Lutcza*, 76 M.J. at 701 (citing *United States v. Wicks*, 73 M.J. 93, 98 (C.A.A.F. 2014)).

Evidence obtained as a result of an unlawful search is inadmissible against the accused if the accused: (1) makes a timely objection; (2) has an adequate interest, such as a reasonable expectation of privacy, in the person, place, or property searched; and (3) exclusion of such evidence "results in appreciable deterrence of future unlawful searches . . . and the benefits of such deterrence outweigh the costs to the justice system." Mil. R. Evid. 311(a). Searches conducted pursuant either to a warrant or to authorization based on probable cause are presumed reasonable. *United States v. Hoffmann*, 75 M.J. 120, 123–24 (C.A.A.F. 2016) (citing *Wicks*, 73 M.J. at 99). However, warrantless searches are presumptively unreasonable unless they fall within a specifically established and well-delineated exception. *Id*. (citing *Wicks*, 73 M.J. at 99).

### a. Omissions in the Affidavit

We first address Appellant's claim that the military magistrate was never provided exculpatory information, namely, the fact that Appellant "was undergoing [medical] treatment, her medications were in the process of being stabilized, and she was temporarily removed from performing [judge advocate] functions until her medications were stabilized." It is undisputed that the military magistrate was not informed of the potential impact Appellant's medications might have on her behavior. But Appellant cannot prevail on that fact alone.

If a false statement is presented to the military magistrate, appellant has the burden to first establish by a preponderance of evidence that the false statement was made "knowingly and intentionally, or with reckless disregard for the truth." Mil. R. Evid. 311(d)(4)(B); *see also Franks v. Delaware*, 438 U.S. 154, 155–56 (1978). Although neither Mil. R. Evid. 311 nor *Franks* expressly extends to omissions, the United States Court of Appeals for the Armed Forces (CAAF) has extended the same rationale to "material omissions." *United States v. Mason*, 59 M.J. 416, 422 (C.A.A.F. 2004). "[E]ven if a false statement or omission is included in an affidavit, the Fourth Amendment is not violated if the affidavit *would still show probable cause* after such falsehood or omission is redacted or corrected." *Id*. (quoting *United States v. Gallo*, 55 M.J. 418, 421 (C.A.A.F. 2001)).

14

The military judge found "no evidence of reckless or deliberate omissions by [the flight chief]." A military judge's finding of fact that the defense did not meet its burden of showing "that the omissions were reckless or intentional" is binding unless clearly erroneous. *Mason*, 59 M.J. at 422 (citations omitted). On appeal, Appellant does not appear to contest the military judge's finding that the flight chief did not recklessly or deliberately omit information from the affidavit. Instead, Appellant focuses on "the legal office" and its failure to inform the flight chief of "key evidence about [Appellant] when they sought the 14 September 2016 authorization for [Appellant]'s blood." But, as the military judge noted, it is of little consequence whether the flight chief was aware of the complications involving Appellant's medications because "probable cause is still established by the evidence otherwise existing at the time the search authorization was granted." Citing the totality of the circumstances test established in *Illinois v. Gates*, 462 U.S. 213 (1983), the military judge found that:

> [P]robable cause supported the search authorization and no flagrant or reckless omissions occurred. . . . All of the relevant information known to [the flight chief] and BDOC at the time of the request for search authorization was communicated to [the military magistrate] and supports probable cause. This information included the smell of alcohol emanating from [Appellant]'s breath, her lack of motor skills, and her abnormal behavior. . . . There is only evidence more than sufficient for [the military magistrate] to find that probable cause existed to, at a minimum, seize [Appellant]'s blood and search it to determine its blood alcohol content. The magistrate did not lack a substantial basis for his decision to grant such search authorization. . . . There is no evidence that [Appellant]'s medication emits any type of odor that might mislead . . . [the flight chief] to believe that the odor was that of alcohol.

We agree with the military judge. Although the military magistrate was "unsure" whether the information regarding the medication would have impacted his decision, he made clear that his decision was based primarily on Appellant's slurred speech and the odor of alcohol emanating from her person. In the absence of any evidence to establish that the medication could give rise to these primary symptoms, we agree with the military judge's conclusion that there was probable cause to grant the search authorization.

### b. Wrongfully Obtained Information in the Affidavit

Appellant also claims that the information upon which the search authorization was based was unlawfully obtained. Appellant argues that the flight chief violated her rights when he "interacted with [Appellant] to see if he

could deceive [Appellant] into providing him with incriminating evidence, even though he understood [Appellant] had already exercised her Article 31, UCMJ, rights." Appellant's argument is premised on two erroneous assumptions.

First, Appellant assumes that the flight chief's requests for her identification were unreasonable under the Fourth Amendment and that her disclosure of her identity was testimonial under the Fifth Amendment. They were not. In evaluating the applicability of these Amendments to Appellant's claim, we need to keep the "unique aspects of the military environment in mind." *See United States v. Long*, 64 M.J. 57, 62 (C.A.A.F. 2006); *United States v. Swift*, 53 M.J. 439, 452 (C.A.A.F. 2000) ("[W]e must be particularly cautious in applying analogies from the civilian sector that involve judicial modifications of judicially-crafted doctrines or that involve interpretation of statutes that do not reflect the unique circumstances of military service." (citation omitted)). As to Appellant's Fourth Amendment claim, "[t]he reasonableness of a seizure under the Fourth Amendment is determined 'by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate government interests.'" *Hiibel v. Sixth Judicial Dist. Court of Nev., Humboldt Cty.*, 542 U.S. 177, 187–88 (2004) (quoting *Delaware v. Prouse*, 440 U.S. 648, 654 (1979)). In conducting such a balancing test, the military judge found that it was

> reasonable to keep [Appellant] in her office as the issue was being addressed given the nature of the location in which [Appellant] was performing duty . . . and given the awkwardness of the officer/enlisted relationship that otherwise can exist if the rumors start flying about an alleged officer drunk on duty if [Appellant] were allowed to wander around outside of her office.

Similarly, the military judge found that the flight chief's request for Appellant's identification made in an effort to observe her movements and obtain information for the police report and blotter entry were reasonably related to Appellant's "independent duty to account." *See United States v. Earle*, 12 M.J. 795, 797 (N.M.C.M.R. 1981). In other words, under the facts of this case, they were "words or actions . . . normally attendant to arrest and custody." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). The flight chief's request for Appellant's identification was reasonable and did not constitute an interrogation. As a result, the slurred speech he heard when Appellant answered his questions was not unlawfully obtained.

Second, Appellant assumes she had a reasonable expectation of privacy in her breath and while inside her government office. She did not. "[I]n examining Fourth Amendment privacy interests, the courts look first to whether the

individual had a subjective expectation of privacy. If the courts ascertain that a subjective expectation of privacy exists, they then determine if that expectation is one that society is prepared to accept as reasonable." *Long*, 64 M.J. at 62 (footnotes omitted). With respect to Appellant's breath, the emanating odor of alcohol is distinguishable from the requirement to submit to a breathalyzer. The latter has been deemed a search subject to the Fourth Amendment because of its requirement for the production of "'deep lung' breath for chemical analysis." *Skinner v. Ry. Labor Execs.' Ass'n*, 489 U.S. 602, 616 (1989) (citations omitted). But the odor emanating from one's natural breath is not subject to the same considerations. The key question is not whether Appellant had a reasonable expectation of privacy in her natural breath, but whether she had a reasonable expectation of privacy in her government office. We find that she did not. There is a rebuttable presumption, in light of the totality of the circumstances, that there is no reasonable expectation of privacy in a government office. Mil. R. Evid. 314(d). Applying this test, the military judge found that Appellant had "fail[ed] to rebut and overcome the presumption that she had ***no*** reasonable expectation of privacy in her government office."[7] Among the factors he considered was the fact that Appellant had been directed not to perform any legal duties and to keep her office door open at all times. Having reviewed the record and considered the totality of circumstances, we agree. Thus, if Appellant had no reasonable expectation of privacy in her government office, she had no reasonable expectation of privacy in the odors emanating therein. *See generally O'Connor v. Ortega*, 480 U.S. 709, 719–26 (1987).

As a final matter, even if we were to find that the flight chief's interaction with Appellant violated her rights under the Constitution and UCMJ, Appellant would not prevail because probable cause would still exist based on the observations made by legal office personnel on the morning of 14 September 2016. *See Gallo*, 55 M.J. at 421. In considering the information from the SJA, DSJA, and other legal office personnel, the military judge was "'confident probable cause would have still existed without the evidence uncovered by' [the flight chief]." (Citation omitted). So are we.

### 2. Admissibility Pursuant to Mil. R. Evid. 312(f)

We next address the military judge's conclusion that the evidence obtained from the search and seizure of Appellant's blood was admissible under

---

[7] In resolving a claim Appellant raised at trial, but not on appeal, the military judge found that Appellant had no reasonable expectation of privacy in the 14 September 2016 search of her government office.

Mil. R. Evid. 312(f). The rule governs intrusions for valid medical purposes. It reads:

> Evidence or contraband obtained in the course of a medical examination or an intrusion conducted for a valid medical purpose is admissible. Such an examination or intrusion may not, for the purpose of obtaining evidence or contraband, exceed what is necessary for the medical purpose.

Mil. R. Evid. 312(f). The Discussion which follows adds, "*Nothing in this rule will be deemed to interfere with the lawful authority of the armed forces to take whatever action may be necessary to preserve the health of a servicemember.*" *Id.*, Discussion (emphasis added).

Mil. R. Evid. 312(f) "is intended to ensure the provision of essential medical care when necessary to preserve the health of servicemembers. The rule permits that evidence found or seized in the course of medical treatment, which is to say, that is incidental to medical treatment, is not subject to suppression." *United States v. Stevenson*, 66 M.J. 15, 18 (C.A.A.F. 2008).[8] In *Stevenson*, CAAF examined whether the Naval Criminal Investigative Service (NCIS) and the Veterans' Affairs (VA) hospital violated the Fourth Amendment by seizing an extra vial of the appellant's blood while he was undergoing routine medical treatment and searching it for DNA evidence without probable cause or a warrant. *Id.* at 16. CAAF held that NCIS and the VA hospital violated the Fourth Amendment. *Id.* It reasoned Mil. R. Evid. 312(f) "permits the admission of evidence discovered during the *regular* course of medical treatment. . . . However, the rule is not intended to serve as cover and concealment for law enforcement inquiries or as an exception to otherwise applicable Fourth Amendment requirements." *Id.* at 18 (emphasis added).

Here, the military judge found that before ever discussing Appellant's status with anyone in the military, the nurse practitioner ordered the blood tests to determine "whether she could prescribe . . . medication [Appellant] re-

---

[8] *Stevenson* examined the previous version of Mil. R. Evid. 312(f) which provided,

> *Intrusions for valid medical purposes.* Nothing in this rule shall be deemed to interfere with the lawful authority of the armed forces to take whatever action may be necessary to preserve the health of a servicemember. Evidence or contraband obtained from an examination or intrusion conducted for a valid medical purpose may be seized and is not evidence obtained from an unlawful search or seizure within the meaning of Mil. R. Evid. 311.

quested, and needed to know what was in [Appellant's] system, and whether alcohol would have contra-indicators." The military judge also considered the fact that Appellant "did not refuse the blood draw." While it is true that Appellant's command was simultaneously seeking a sample of Appellant's blood, this fact alone does not mean that the sample could not have been taken for a valid medical purpose. *See United States v. Miller*, 35 C.M.R. 292 (C.M.A. 1965). The nurse practitioner ordered the blood tests before speaking with anyone in the military and there is no evidence that she collected more than what was necessary to treat Appellant. Additionally, the tests were taken within 20 minutes of Appellant's admission into the ER and without Appellant's objection. These factors led the military judge to conclude that the hospital staff drew Appellant's blood for a valid medical purpose. We agree.

Accordingly, the military judge did not abuse his discretion in denying Appellant's motion to suppress the results of the search of Appellant's blood.

## B. The Search and Seizure of Appellant's Urine

The military judge found that Appellant's urine was obtained for a valid medical purpose and consequently admissible under Mil. R. Evid. 312(f). We disagree.

The circumstances leading to the seizure of Appellant's urine are significantly different than those leading to the seizure of her blood. As previously mentioned, when the nurse practitioner asked Appellant to provide a urine sample for medical treatment, she refused. The commander then ordered her to provide a urine sample. When she could not provide an adequate sample, hospital staff obtained her urine sample through a catheter.

Notwithstanding these differences, the military judge found that, like the blood draw, the evidence obtained from the seizure of Appellant's urine fell within the scope of Mil. R. Evid. 312(f). The following excerpt from his ruling is relevant to our analysis:

> There was much argument at the motions hearing about whether the catheterization exceeded what was necessary for the medical purpose of obtaining [Appellant]'s urine. Clearly, the HMC staff did not believe [Appellant] was suicidal or homicidal. [The nurse practitioner] conceded this fact. Also clear is that at the time [Appellant] was catheterized, [the military medical provider] did not consider [Appellant] to be in such a morbid "life or death" state that he would have forced her to be catheterized at that time.
>
> [The nurse practitioner] was, however, told by a licensed doctor—[the military medical provider]—that [Appellant] was "mandated" to provide a urine sample. That was the medical

> authorization [the nurse practitioner] was operating [sic] when she authorized [Appellant]'s catheterization. In short, she authorized [Appellant]'s catheterization based on "doctor's orders;" specifically, [the military medical provider]'s. [The military medical provider] never informed [the nurse practitioner] that he was ordering the labs only because of his belief—mistaken or otherwise—that a "judge's order" required the urine to be tested that night. [The nurse practitioner]'s conversation with [the military medical provider] led her to believe that [the military medical provider] needed the labs for medical, not judicial or investigative, purposes.

> In short, the catheterization was authorized and performed in the course of a medical examination and was an intrusion conducted for a valid medical purpose. It is therefore admissible under this rule.

The analysis which led us to conclude that the military judge did not abuse his discretion in finding that Appellant's blood was drawn for a valid medical purpose leads us to the opposite conclusion regarding the military judge's finding regarding Appellant's urine. Applying the above standards set forth in *Stevenson*, we consider whether Appellant's urine was obtained "during the *regular* course of medical treatment." 66 M.J. at 18. We find that it was not. Our conclusion turns on one fact which is not in dispute: At the time Appellant's urine was collected, Appellant was not in an emergent condition which warranted involuntary catheterization for a medical purpose.

The military judge focused on two facts: (1) that from the outset of treatment, the nurse practitioner "wanted" a urine sample in order to properly diagnose and treat Appellant; and (2) that the nurse practitioner was unaware that the military medical provider's "order" for Appellant to provide a urine sample was for a law enforcement rather than a medical purpose. In later clarifying his ruling, he outlined the timeline of events as the nurse practitioner would have seen them:

> "I was never told there was a judicial order. . . . [T]here's just my need for urine; [Appellant] refusing. But in an addition to that, [Appellant] is military and I've got a doctor from the military telling me that he needs the urine--ostensibly for medical purpose," and she's also authorized to order the urine.

The military judge concluded that "it's dispositive what [the nurse practitioner] is operating off of. What information she's using to inform her decision to do a urinalysis." In other words, the military judge found the nurse practitioner's belief as to the basis for the search singularly dispositive of whether

the urine was collected for a medical purpose. We disagree.[9] It is of no consequence that the nurse practitioner was ignorant of the existence or contents of the search authorization and of the fact Appellant had been ordered to provide a sample. Rather, the dispositive fact is that Appellant's urine sample would not have been collected *but for* the government intrusion. As previously noted, the nurse practitioner would not have involuntarily catheterized Appellant because she was neither suicidal nor homicidal. Similarly, Appellant would not have cooperated but for the commander's order for her to provide a urine sample. In other words, even though the urine test was initially requested for a valid medical purpose, the seizure of Appellant's urine did not occur in the *regular course* of medical treatment at the time it was collected. Rather, it was collected at the behest of command and law enforcement officials and in the absence of a medical purpose to catheterize Appellant without her consent.

As such, the military judge abused his discretion in finding the evidence admissible under Mil. R. Evid. 312(f).

**C. Application of the Exclusionary Rule**

Because Appellant's urine was not collected for a valid medical purpose, its taking was subject to the Fourth Amendment's protections against unreasonable search and seizure. The military judge found that, even if the search of Appellant's urine was unlawful and no exceptions applied, the exclusionary rule would not be appropriate in Appellant's case. As a final matter, we consider whether the military judge abused his discretion in reaching that conclusion.

The exclusionary rule is "a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved." *United States v. Calandra*, 414 U.S. 338, 348 (1974). Whether to apply the exclusionary rule is "an issue separate from the question whether the Fourth Amendment rights of the party seeking to invoke the rule were violated by police conduct." *Gates*, 462 U.S. at 223 (citations omitted). The Supreme Court has cautioned that "exclusion 'has always been our last resort, not our first impulse.'" *Herring v. United States*, 555 U.S. 135, 140 (2009) (quoting *Hudson v. Michigan*, 547 U.S. 586, 591 (2006)).

---

[9] Even if the nurse practitioner's belief belongs at the center of this analysis—and we do not find that it does—her beliefs were only that Appellant either consented or was required to consent because she was a servicemember. Thus, a medical purpose was not the driving force behind the nurse practitioner's order to catheterize Appellant.

Before the Supreme Court's decision in *Herring*, the exclusionary rule applied when evidence did not fit within one of several delineated exceptions. In *Herring*, the Supreme Court provided greater limitations to its application. It held:

> To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system. As laid out in our cases, the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence.

*Id.* at 144.

The military adopted the Supreme Court's "appreciable deterrence" standard in a change to the military rule of evidence governing unlawful searches and seizures, Mil. R. Evid. 311, which became effective shortly before Appellant's trial. The rule now provides that evidence is subject to exclusion when it satisfies three criteria:

> (1) the accused makes a timely motion to suppress or an objection to the evidence under this rule;

> (2) the accused had a reasonable expectation of privacy in the person, place, or property searched; the accused had a legitimate interest in the property or evidence seized when challenging a seizure; or the accused would otherwise have grounds to object to the search or seizure under the Constitution of the United States as applied to members of the Armed Forces; and

> (3) *exclusion of the evidence results in appreciable deterrence of future unlawful searches or seizures and the benefits of such deterrence outweigh the costs to the justice system*.

Mil. R. Evid. 311(a) (emphasis added).

In this case, the military judge focused on the final criterion—balancing the appreciable deterrence of future unlawful searches and seizures against the cost to the justice system. More specifically, he focused on the rule's goal "to deter police misconduct." In considering whether to apply the exclusionary rule in Appellant's case, he found that the Government met its burden to show, "by a preponderance of the evidence, that the deterrence of future unlawful searches or seizures is not appreciable and, to the extent there is any at all, such deterrence does not out-weigh the costs to the justice system of excluding the evidence." In reaching his conclusion, the military judge reasoned:

> [U]tilization of the exclusionary rule and suppression is inappropriate in this case and runs counter to the "deterrence of law enforcement overreach" message for which the rule was originally created. There is little, if any, appreciable deterrent effect to be gained by the application of the rule to these circumstances. This particular fact pattern is unique, and anything similar is unlikely to recur. Based on the inimitable facts of this case, coupled with the efforts to ensure the rights of [Appellant] were supported (not trampled) by walling off the experts in the legal office staff so they could support [Appellant], application of the exclusionary rule is inappropriate. Any wrong done to [Appellant]'s rights was by accident, not design. To paraphrase *Williams*, to suppress reliable evidence when doctors, nurses, commanders, and legal practitioners are all trying to help [Appellant] . . . and miscommunicate when trying to actually protect [Appellant] from tainted advice to a neutral and detached magistrate, "makes no sense" because to "do so would hardly enhance the goals of the exclusionary rule-deterring police misconduct."

(Citation omitted).[10]

The military judge's ruling clearly reflects the extent to which he grappled with the changes to Mil. R. Evid. 311 and its goal of deterring police misconduct. As he did in his analysis of Mil. R. Evid. 312(f), the military judge focused on whether the violations were intentional violations of Appellant's constitutional rights. We agree with the military judge's conclusion that there is no evidence that the command representatives, law enforcement, or the medical staff intended to violate Appellant's rights. But our analysis does not end there. The Supreme Court's decision in *Herring* does not require deliberate conduct. As outlined above, the Supreme Court also prohibited "reckless" and "grossly negligent" conduct. *Herring*, 555 U.S. at 144. The military judge does not appear to have considered whether it was reckless or grossly negligent for the flight chief to delegate his law enforcement duty to execute the search authorization to the military medical provider—a non-law enforcement officer—or for other military personnel to execute a search authorization without first confirming its parameters. We do so now.

---

[10] The military judge cites this court's decision in *United States v. Williams*, 54 M.J. 626, 630 (A.F. Ct. Crim. App. 2000). In *Williams*, we considered whether the good-faith exception applied to a commander's decision to order appellant to submit to a urinalysis when entering pretrial confinement.

At trial, Appellant's trial defense team argued that the flight chief's decision to delegate his duty to execute the search authorization to the military medical provider was conduct that should be deterred. The Defense called a senior law enforcement officer to testify that it is a "best practice" to accompany an accused to the hospital to ensure that the military magistrate's search authorization was effectuated. The military judge's ruling included only one conclusion of law regarding Appellant's argument that the flight chief's conduct should be deterred: "[I]t simply matters naught what [the senior law enforcement agent] would have done, in hindsight, if he were in [the flight chief]'s shoes if such actions are not part of any [standard operating procedures] [the flight chief] violated." We have no objection to the military judge's finding giving little weight to the senior law enforcement agent's testimony and certainly do not find that finding clearly erroneous. Our objection lies in the military judge's failure to consider the legal question of whether the flight chief's conduct was "reckless" or "grossly negligent." The Supreme Court has found it "incumbent on the officer executing a search warrant to ensure the search is lawfully authorized and lawfully conducted." *Groh v. Ramirez*, 540 U.S. 551, 563 (2004).

Unsurprisingly, we are unable to find any legal precedent which stands for the proposition that a law enforcement officer can simply turn over his duties to a non-law enforcement officer and absolve himself of the scrutiny of the Fourth Amendment. Such a proposition would be especially difficult to uphold in the military context where even those who are not law enforcement officers regularly perform law enforcement duties. *See* Mil. R. Evid. 315(e)(1) and Mil. R. Evid. 316(d). In *United States v. Murray*, our sister court upheld a military judge's decision to suppress evidence obtained by medical providers during a sexual assault nurse examination that was "devoid of oversight or direction by law enforcement." No. NMCCA 201200295, 2012 CCA LEXIS 308, at *15 (N.M. Ct. Crim. App. 21 Aug. 2012) (unpub. op.). The facts of *Murray* are distinct from the case before us, but highlight the importance of a law enforcement agent's responsibility to "ensure the search is lawfully authorized and *lawfully conducted.*" *Groh*, 540 U.S. at 563 (emphasis added).

Here, in the flight chief's absence, a number of individuals participated in the execution of the search authorization. The military medical provider informed the medical staff that Appellant was "'mandated' to provide a urine sample." Similarly, Appellant's first sergeant "informed the hospital staff that [Appellant] was military and was mandated to submit to a urinalysis while there." Despite being recused from participation in obtaining or executing the search authorization, the SJA and the DSJA advised the commander on whether he could order Appellant to comply with the search authorization—a search authorization they had not seen. In accordance with their advice, the commander ultimately gave the order which resulted in the unlaw-

ful search and seizure of Appellant's urine and the charge against her for wrongful use of cocaine.

In this case, a military medical provider, a commander, a first sergeant, an SJA, and a DSJA acted in a law enforcement capacity when they participated in executing the search and seizure authorization. We, like the military judge, recognize that Appellant's medical emergency served as the backdrop for the actions taken by these individuals. But we disagree with his conclusion that it absolved them of accountability under the Fourth Amendment. There is no debate that their actions exceeded the scope of the authorization for the simple reason that they did not bother to determine its scope. Although the military judge found that "any of those individuals could have clarified that the search authorization granted did not authorize the seizure and subsequent search of [Appellant]'s urine," he did not consider them to be "police" under the Fourth Amendment.

There was little authority available to help resolve this issue for the military judge. Indeed, this case highlights the challenges of applying civilian Fourth Amendment jurisprudence to the military environment. The central question is whether military personnel other than designated law enforcement can be considered "police" in evaluating the exclusionary rule's goal of deterring "police" misconduct. We hold that they can. *But cf United States v. lrizarry*, 72 M.J. 100, 106 (C.A.A.F. 2013) (finding that it was reasonable for military personnel to enter an off-base apartment to effectuate their command responsibilities when they had "no law enforcement purpose and no expectation that a crime had been committed, or that evidence would be found."). As we have discussed, military personnel who are not designated law enforcement officers may perform certain law enforcement duties, including searches and seizures. *See* Mil. R. Evid. 315(e)(1), 316(d). When they do so, their actions must be evaluated as law enforcement officers, not as bystanders. Put another way, in the military, one need not possess a police uniform to be subjected to the scrutiny of the Fourth Amendment.

The SJA directed members of his office to recuse themselves from participating in the investigation of Appellant because he "knew that ethically, they could not be witnesses against [Appellant] and simultaneously provide support to, and also advise on the case against, her." Yet, after Appellant had been placed in the care of medical professionals and after she had provided a sample of blood, both the SJA and members of his office actively participated in securing Appellant's urine as evidence against her. Perhaps most concerning is that when it became apparent they did not know the parameters of the search authorization, they executed the search authorization nonetheless. When discussing whether they should advise the commander to order Appellant to provide a urine sample, the DSJA asked, "What is the PC for? Urine

Sample?" Rather than direct the commander to consult the neutral legal advisor, they unilaterally concluded that "the PC was a [sic] search for evidence of intoxicating substances" and informed the commander accordingly. The commander testified that the primary reason he gave the order was to "effectuate the search authorization." Though he also "thought it was important for [her] to submit to the medical treatment," he did not believe she "was in any type of emergent medical risk." In *United States v. Cowgill*, 68 M.J. 388, 392 (C.A.A.F. 2010), the court noted that it was reckless "for the local detective not to validate the affidavit and its contents with the [AFOSI] before submitting it to the magistrate." We likewise conclude that it was reckless for the military personnel in Appellant's supervisory and command chain—notably including an SJA and a DSJA—to participate in the law enforcement activity of executing a search authorization without confirming its parameters.

Finally, we note that the flight chief's absence precipitated the decisions of those who acted in his stead. He was well aware of the scope of the search authorization and could have easily ensured its compliance. Indeed, the flight chief testified that urine would have not been a good option to pursue precisely for the reason that Appellant could have refused to provide a sample. These types of complications in the execution of a search are often the subject of Fourth Amendment scrutiny and ultimately led to the creation of the good faith exception to the exclusionary rule which distinguished errors in the warrant from errors in its execution. *United States v. Leon*, 468 U.S. 897 (1984); *cf. United States v. Eppes*, 77 M.J. 339, 350 n.2 (C.A.A.F. 2018) (Ryan, J., concurring) ("[T]he [*Leon*] good-faith exception will not 'save an improperly executed warrant.'" (citation omitted)), *cert. denied*, __ U.S.__, 2018 U.S. LEXIS 7131 (2018).

To be fair, we recognize the complexity the facts of this case present. The military judge correctly considered the unique circumstances of having an SJA recuse himself and Appellant's medical emergency en route to executing a probable cause search authorization. We find no error in his consideration of these facts. Rather, the military judge abused his discretion because he failed to consider the Supreme Court's prohibitions against reckless and grossly negligent conduct and failed to include non-designated law enforcement personnel acting in a law enforcement capacity in balancing whether the exclusionary rule should be applied in Appellant's case.

In conducting the balancing test set forth in Mil. R. Evid. 311(a)(3), the military judge concluded that "[l]ittle can be gained, and much would be lost, if ER nurses second-guessed doctors or themselves out of fear they were violating a patient's Fourth or Fifth Amendment rights." But the military judge—despite assuming that the search was invalid for his exclusionary rule analysis—failed to consider that such a chilling effect would have been avoid-

ed had the involuntary catheterization been *medically* warranted. Indeed, that is the very purpose of Mil. R. Evid. 312(f). The military judge also failed to consider the military's willingness to balance other interests, such as a servicemember's need for treatment, against society's interest in prosecuting known drug abuse. *See* Air Force Instruction (AFI) 44–121, *Alcohol and Drug Abuse Prevention and Treatment (ADAPT) Program*, ¶ 3.7.1.2.3 (8 Jul. 2014) (a servicemember's voluntary disclosure of drug use may not be adversely used against them). Similarly, the Supreme Court has recognized the societal interest in protecting against unwarranted bodily intrusions, describing them as intrusions into the "most personal and deep-rooted expectations of privacy." *Winston v. Lee*, 470 U.S. 753, 758–60 (1985) (citing *Schmerber v. California*, 384 U.S. 757, 767 (1966)). The decision to invasively seize a servicemember's bodily fluids against her will is not one which should be made without ensuring there is a lawful reason to do so. Based on the totality of facts and circumstances in this case, we find that exclusion of the evidence from the search and seizure of Appellant's urine is appropriate in Appellant's case. Weighing the factors set forth in Mil. R. Evid. 311(a)(3), we find that the loss of a single specification of wrongful use of cocaine is worth the appreciable deterrence of future unlawful searches.[11]

## III. CONCLUSION

The finding of guilty to the Specification of the Additional Charge and to the Additional Charge is **SET ASIDE** and **DISMISSED WITH PREJUDICE**. The sentence is **SET ASIDE** and the case is returned to the Judge Advocate General for further processing consistent with this opinion. A rehearing on sentence is authorized. Article 66(e), UCMJ, 10 U.S.C. § 866(e).

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court

---

[11] At trial, multiple witnesses testified that no one suspected Appellant of wrongfully using cocaine prior to learning of her urinalysis results at HMC. The record is clear that the remaining evidence supporting Appellant's conviction for wrongful use of cocaine is derivative of the unlawful search and seizure of her urine.